Elizabeth FREER, Plaintiff-Appellant,†

v.

M&I MARSHALL & ILSLEY CORPORATION, Defendant-Respondent.

Court of Appeals

*No. 03–3175. Submitted on briefs August 24, 2004.—Decided September 21, 2004.*

2004 WI App 201

(Also reported in 688 N.W.2d 756.)

† Petition to review filed.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James P. Brennan* of *Brennan & Collins*, of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Mary Pat Ninneman* of *Quarles & Brady LLP*, of Milwaukee.

Before Wedemeyer, P.J., Fine and Lundsten, JJ.

¶ 1. FINE, J. Elizabeth Freer appeals from a summary judgment dismissing her complaint against M&I Marshall & Ilsley Corporation alleging that an employee of Marshall & Ilsley had slandered her. We affirm.

## I.

¶ 2. According to her complaint, Freer worked for Marshall & Ilsley Bank from 1984 until 1995, when "by mutual agreement" her "employment with [Marshall & Ilsley] was terminated." Freer's complaint also asserts that she was hired as a "trust sales representative," and "[a]t the time of the termination [she] was employed as a vice president of sales."

¶ 3. Freer's complaint alleged that after she left Marshall & Ilsley, she became "an equity partner" in Capital Investment Services of America, Inc., "as an

investment counsel," and, as such, "solicited business customers in southern California." The following is the nub of Freer's defamation claim as set out in her complaint:

> That [Ruth A.] Sherman then identified herself as a resident of the Los Angeles, California area, who was interested in investing with [Freer] and her employer, Capit[a]l Investment Services of America, Inc., and was seeking some information and references regarding [Freer] from [Marshall & Ilsley].

> Ruth A. Sherman asked Joanne Matchette what position had been held by [Freer] at [Marshall & Ilsley]. Matchette replied that [Freer] was employed as a sales person. When Sherman stated that she thought [Freer] was an investment manager, Matchette replied, "Oh no, Elizabeth had no such position. Elizabeth was never anything other than a sales person, although she did some marketing too." Matchette further informed Ruth A. Sherman "that Freer had never been a money manager, had never been an investment manager, nor was Freer in any type of management position at M & I." Matchette then repeated to Ruth A. Sherman "that Freer never had held a management position." Ruth A. Sherman further asked Matchette if [Freer] had ever held a position at [Marshall & Ilsley] where she managed anyone's investment portfolio and Matchette replied "Oh, absolutely not."

¶ 4. WISCONSIN STAT. RULE 802.03(6) requires that: "In an action for libel or slander, the particular words complained of shall be set forth in the complaint, but their publication and their application to the plaintiff may be stated generally." Thus, Freer's slander claim is limited to Matchette's alleged conversation with Sherman, and to the specific words she contends that Matchette used. Freer's complaint asserts that those words "defamed and slandered [Freer] in that the

725

statements were false and not privileged and harmed [Freer]'s reputation so as to lower her in the estimation of Ruth A. Sherman who subsequently withdrew from associating and dealing with [Freer] and doing business with her." Freer's complaint alleges no other damage. Thus, as explained below, her claim against Marshall & Ilsley fails unless Matchette's words were slanderous *per se*. We hold that they are not.

## II.

A. *WISCONSIN STAT. RULE 802.05.*

¶ 5. Before we begin our analysis of the narrow ultimate legal issue presented by this appeal, namely whether Matchette's words were slanderous *per se,* we are disturbed that Freer's complaint asserts things that conflict with the summary-judgment evidentiary record: That Sherman was "[o]ne of those customers" within Freer's range of business solicitation; that Sherman "was interested in personally investing with [Freer]"; and that Sherman "withdrew from associating and dealing with [Freer] and doing business with her" as a consequence of what Matchette told her. According to the evidentiary record, however, Sherman was neither an investor nor potential investor with either Capital Investment Services or Freer. Rather, as Freer conceded in her deposition and in her brief before the trial court, Sherman was retained for $200 to test what response an inquiry to Marshall & Ilsley about Freer would turn up. Although Freer's briefs on appeal assert that Sherman *was* a bona fide potential investor with Freer, Freer points to nothing in the evidentiary record that supports her contention, and, of course, we are bound by the record as it comes to us. *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633, 642 (Ct. App. 1992). Thus, for example, Sherman's affidavits merely aver

that she *told* Matchette that she was seeking informa-
tion about Freer in order to decide whether to do
business with Freer, *not* that that was her *actual* intent
in seeking Matchette's comments about Freer.[1]

¶ 6. Wɪsᴄᴏɴsɪɴ Sᴛᴀᴛ. Rᴜʟᴇ 802.05(1)(a) provides, as
material here:

> Every pleading . . . of a party represented by an attor-
> ney shall contain the name . . . of the attorney . . . and
> shall be subscribed with the handwritten signature of
> at least one attorney of record. . . . The signature of an
> attorney . . . constitutes a certificate that the attor-
> ney . . . has read the pleading . . .; that to the best of the
> attorney's . . . knowledge, information and belief,
> formed after reasonable inquiry, the pleading . . . is
> well-grounded in fact.

Rᴜʟᴇ 802.05(1)(a) also provides, as material here:

> If the court determines that an attorney . . . failed to
> read or make the determinations required under this
> subsection before signing any . . . paper, the court may,
> upon motion, or upon its own initiative, impose an

---

[1] Although Freer filed an affidavit with the trial court in
July of 2003 that seems to contradict her affirmation in her
April 2003 deposition that her prior lawyers had hired Sherman
"to do what [the prior lawyer] called a test reference check with
M&I regarding" Freer, that affidavit, which avers that "a
customer named Ruth A. Sherman was interested in personally
investing with" Freer, is not only hearsay as to what Sherman's
intentions were and thus is not part of the summary-judgment
evidentiary record, *see* Wɪs. Sᴛᴀᴛ. Rᴜʟᴇ 802.08(3) ("[s]upporting
and opposing affidavits shall be made on personal knowledge
and shall set forth such evidentiary facts as would be admissible
in evidence"), but, also, cannot contradict Freer's earlier depo-
sition testimony, *see Yahnke v. Carson,* 2000 WI 74, ¶ 21, 236
Wis. 2d 257, 270, 613 N.W.2d 102, 108–109.

727

appropriate sanction on the person who signed the pleading . . . or on a represented party, or on both. The sanction may include an order to pay the other party the amount of reasonable expenses incurred by that party because of the filing of the pleading . . . including reasonable attorney fees.

We are not a fact-finding court. *Wurtz v. Fleischman*, 97 Wis. 2d 100, 107 n.3, 293 N.W.2d 155, 159 n.3 (1980). Accordingly, we remand this matter to the trial court with directions that it hold a hearing to determine: (1) Sherman's true role in this case; (2) what and when Freer and her lawyer knew of Sherman's true role in this case; and (3) whether the statements in Freer's appellate briefs about Sherman are true, even though they are not supported by the summary-judgment evidentiary record. By virtue of our superintending authority over the circuit court, WIS. STAT. § 752.02 ("[t]he court of appeals has supervisory authority over all actions and proceedings in all courts except the supreme court"), we direct the trial court to report its findings to us, and, in connection with items 1 and 2, and, depending on its findings, to impose under RULE 802.05(1)(a) any sanction that in the exercise of its reasoned discretion it believes is appropriate. We retain jurisdiction over this appeal, pending receipt of the trial court's report.

B. *Slander per se.*

¶ 7. As noted, this case comes to us from the trial court's grant of summary judgment to Marshall & Ilsley dismissing Freer's complaint. Our review of a trial court's grant of summary judgment is *de novo. Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–317, 401

N.W.2d 816, 820–821 (1987). In order to survive summary judgment, the party with the burden of proof on an element in the case must establish that there is at least a genuine issue of fact on that element by submitting evidentiary material "set[ting] forth specific facts," WIS. STAT. RULE 802.08(3), pertinent to that element, *Transportation Ins. Co. v. Hunzinger Constr. Co.*, 179 Wis. 2d 281, 290–292, 507 N.W.2d 136, 139–140 (Ct. App. 1993).

¶ 8. A person who claims that his or her reputation has been unlawfully damaged by something someone else has said must first establish that the words are not true and are capable of a defamatory meaning. *See Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 461, 113 N.W.2d 135, 140 (1962). Whether words are capable of a defamatory meaning is an issue of law for the court. *Ibid.* Although Marshall & Ilsley contends that what Matchette told Sherman is not defamatory, we need not reach that issue or other defenses asserted by Marshall & Ilsley because assuming without deciding that Matchette's words to Sherman as quoted in the complaint are both false and capable of a defamatory meaning, Freer has neither pled nor submitted any evidentiary material showing that she sustained any damage as a result of what Matchette is alleged to have told Sherman, and, as we show below, Matchette's words are not slanderous *per se. See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issues need be addressed); *State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514, 520 (Ct. App. 1989) (cases should be decided on the "narrowest possible ground").

¶ 9. Slander, of course, is distinguished from libel because, unlike libel, where the defamation is written, slander is oral. *Bauer v. Murphy*, 191 Wis. 2d 517, 524, 530 N.W.2d 1, 3 (Ct. App. 1995). Slander is not actionable unless: (1) the plaintiff either both pleads and proves "special damages," or (2) the slander is "actionable *per se.*" *Martin*, 15 Wis. 2d at 459, 113 N.W.2d at 138–139. We address these two matters in turn.

1. Special damages.

¶ 10. Freer has not demonstrated in her summary judgment submissions that she sustained any damage as a result of what Matchette said to Sherman, and has not submitted any sworn statement, by affidavit or deposition, from any other person to whom employees of Marshall & Ilsley said bad things about her. Freer has attempted, however, to show special damages by submitting an elaborate "Lost Income Computation" prepared by a certified public accountant and business appraiser Freer hired. (Uppercasing omitted.) That analysis, however, is based on what the accountant says he was told by Larry Crober, who allegedly sought to steer business to Freer by virtue of his position with a California bank. This does not suffice. First, what Crober may have told the accountant is hearsay and not "evidentiary facts as would be admissible in evidence," which is required of summary judgment submissions. *See* WIS. STAT. RULE 802.08(3). Second, the only alleged defamatory statements set out in Freer's complaint, as required by WIS. STAT. RULE 802.03(6), are those Freer claims were made by Matchette to Sherman, and thus Freer needed to show pecuniary loss resulting from *those* statements. This she has not done. Indeed, in his deposition, Freer's

accountant admitted that the period covered by his analysis predated Matchette's alleged statements to Sherman.

2. Actionable *per se.*

¶ 11. As noted, there is a type of slander that is "actionable without proof of damages" because damages are "presumed from the character of the defamatory language." *Martin*, 15 Wis. 2d at 459, 113 N.W.2d at 139. Such slander, slander *per se,* is limited to the following four narrow circumstances:

- "imputation of certain crimes" to the plaintiff; or

- "imputation . . . of a loathsome disease" to the plaintiff; or

- "imputation . . . of unchastity to a woman" plaintiff; or

- defamation "affecting the plaintiff in his business, trade, profession, or office."

*Ibid.* Whether, as the Concurrence/Dissent opines, these categories "make sense" in this era, Concurrence/Dissent at ¶ 17, they are universal in our jurisprudence. *See* RESTATEMENT (SECOND) OF TORTS § 570 (1977).[2] It is into

---

[2] The RESTATEMENT (SECOND) OF TORTS § 570 (1977), recognizes:

> One who publishes matter defamatory to another in such a manner as to make the publication a slander is subject to liability to the other although no special harm results if the publication imputes to the other
>
> > (a) a criminal offense, as stated in § 571, or
> >
> > (b) a loathsome disease, as stated in § 572, or

the last category, defamation "affecting the plaintiff in his business, trade, profession, or office," that Freer seeks to squeeze what Matchette told Sherman. She fails because there is nothing *inherently* defamatory about Matchette's statements.

¶ 12. It is settled in Wisconsin that words are not slanderous *per se* if anything other than the words are needed to make them defamatory. *Bauer*, 191 Wis. 2d at 530, 530 N.W.2d at 6; *Kassowitz v. Sentinel Co.*, 226 Wis. 468, 472, 476, 277 N.W. 177, 179, 180–181 (1938) (The defamation must be "apparent from the words themselves"; " '[w]ords which are defamatory *per se* do not need an innuendo, and, conversely, words which do need an innuendo are not defamatory *per se*.' ") (quoted source omitted), *criticized on other grounds, Martin*, 15 Wis. 2d at 460–461, 113 N.W.2d at 139; *see Bauer*, 191 Wis. 2d at 530–531 n.12, 530 N.W.2d at 6 n.12 (recognizing continued vitality of *Kassowitz* on what is slander *per se*). This is the law elsewhere as well. *See Holsapple v. Smith*, 599 S.E.2d 28, 33 (Ga. Ct. App. 2004) (" 'To determine whether a declaration constitutes slander per se, the court looks to 'the plain import of the words spoken' and will not enlarge their meaning by innuendo.' ") (quoted source omitted) (charging that plaintiff "screwed a client" and " 'intentionally messed things up in Florida' " both "could possibly be considered a charge 'against another in reference to his trade, office, or profession, calculated to injure him therein.' "); *Cook v. Winfrey*, 141 F.3d 322, 329–330 (7th Cir. 1998) (" 'Slander *per se* means that the slander is

(c) matter incompatible with his business, trade, profession, or office, as stated in § 573, or

(d) serious sexual misconduct, as stated in § 574.

accomplished by the very words spoken.' ") (quoted source omitted) (calling someone a "liar" passes motion-to-dismiss muster because it was error, at that stage of the lawsuit, to conclude that the charge "could not have been of a type that would 'tend to injure [plaintiff] in his trade or occupation.' ") (applying Ohio law). This is an inquiry limited to the words themselves without reference to history or gloss. Indeed, one of the core non-Wisconsin decisions upon which the Concurrence/Dissent relies, *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296 (Ill. 1996), makes this clear. In *Anderson*, a fund-raiser seeking a job complained that her prior employer disparaged her by telling a potential employer that she " 'did not follow up on assignments' and that 'she could not get along with her coworkers.' " *Id.*, 667 N.E.2d at 1298. *Anderson* declined to look beyond the words used, and held that they were not defamatory *per se* because those words could have been non-defamatory in reference to others. *Id.*, 667 N.E.2d at 1301–1302. Similarly, the other core non-Wisconsin decision upon which the Concurrence/Dissent relies, *Shaw Cleaners & Dyers, Inc. v. Des Moines Dress Club*, 245 N.W. 231 (Iowa 1932), also recognized that "it is quite clear that, in determining the question as to whether the allegations of the petition are libelous per se, we must consider only the unambiguous language of the published advertisement hereinbefore quoted, regardless of any pleaded innuendo." *Id.*, 245 N.W. at 234.

¶ 13. The following statements, allegedly made by Matchette to Sherman, are not slanderous *per se* because they need context outside of the words themselves to be perceived as defamatory: that Freer was "never an investment manager"; that Freer "was never anything other than a sales person, although she did

733

some marketing too"; that Freer "had never been a money manager, had never been an investment manager"; and that Freer was never "in any type of management position at M & I." *See Kassowitz*, 226 Wis. at 471–477, 277 N.W. at 178–181 (charging that someone had an " 'arrested case of tuberculosis' " did not impute a "loathsome and a contagious" disease to that person because matters outside the words themselves are needed to convey the meaning that the charge "is understood by the general public and by the readers of the defendant's papers to mean an individual who is still tubercular and subject to the same hazards of relapse and spread of disease as is common in cases of clinical and manifest tuberculosis"); *see also* RESTATEMENT (SECOND) OF TORTS § 573 cmt. c, illus. 1–6 (Calling a bricklayer a "hypocrite," saying a clerk "consorts with prostitutes," and calling a university professor a "drunk," all require proof of special damages to be actionable; saying that a lawyer "is ignorant and unqualified to practice law," saying that a merchant is "insolvent," and calling a merchant "insane," are all actionable without proof of special damages.). Simply put, many business people undoubtedly fall within the ambit of employment encompassed by Matchette's alleged statements to Sherman about Freer and lead proud and productive lives. *See Anderson*, 667 N.E.2d at 1301–1302 (words that could be non-defamatory if applied to others are not defamatory *per se*).[3]

---

[3] We respectfully disagree with the Concurrence/Dissent's reading of both *Kassowitz v. Sentinel Co.*, 226 Wis. 468, 277 N.W. 177 (1938), and *Bauer v. Murphy*, 191 Wis. 2d 517, 530 N.W.2d 1 (Ct. App. 1995). First, *Bauer* adhered to *Kassowitz's* recognition that "[w]ords which are defamatory *per se* do not need an innuendo, and, conversely, words which do need an innuendo

¶ 14. Freer has not satisfied her summary-judgment burden to show special damages she suffered as a result of what Matchette may have told Sherman, and, additionally, Matchette's alleged statements to

are not defamatory *per se.*" *Bauer*, 191 Wis. 2d at 530, 530 N.W.2d at 6 (quoting *Kassowitz*, 226 Wis. at 476, 277 N.W. at 180) (footnote and internal quotation marks omitted). Thus, *Bauer* held that calling a female former member of the university basketball team a "disgrace" was not slander *per se* "in the context in which the remark was made" even though the discussion that preceded the "disgrace" charge implicated her in an "inappropriate relationship" with an assistant coach who was suspended as a result of that alleged relationship. *Bauer*, 191 Wis. 2d at 520–521, 532, 530 N.W.2d at 2, 6. If the context of that *discussion* was material, there were, as *Bauer* noted, arguably other things to which the "disgrace" remark might have referred, including insubordination, *id.*, 191 Wis. 2d at 522 n.1, 530 N.W.2d at 2 n.1, and a dispute whether the "disgrace" remark referred to those other matters or, as the plaintiff argued, the "inappropriate relationship" discussion, would have required a trial, *id.*, 191 Wis. 2d at 523 n.2, 530 N.W.2d at 3 n.2. Accordingly, the "context" discussed by *Bauer* in the part quoted by the Concurrence/Dissent is clearly limited to the word "disgrace" only and did not encompass the roiling finger-pointing session that preceded use of that word. Stated another way, given the no-extraneous-information rule recognized by both *Kassowitz* and *Bauer*, and *Bauer*'s failure to remand for trial to ascertain to what the "disgrace" comment referred, *Bauer* would not have concluded that the "disgrace" comment was slander *per se* even if the preceding discussion *only* concerned the plaintiff's alleged "inappropriate relationship" with the assistant coach. Second, contrary to the Concurrence/Dissent, *Kassowitz* did not opine that a person with tuberculosis would not be shunned, but, rather, held that saying that someone had an "arrested case" of the disease did not, focusing on the words only, charge that the person either was *currently* afflicted with a loathsome disease or had engaged *in* any immoral conduct. *Kassowitz*, 226 Wis. at 475, 277 N.W. at 180.

Sherman were not slanderous *per se.* Accordingly, the trial court did not err in dismissing Freer's complaint against Marshall & Ilsley.

*By the Court.*—Judgment affirmed and cause remanded with directions.

¶ 15. LUNDSTEN, J. (*concurring/dissenting*). I join part II.A. of the majority decision in which it remands for a determination of whether sanctions should be imposed under WIS. STAT. § 802.05. I agree that it appears from the record that the "potential client" who called Marshall & Ilsley seeking reference information on Freer was not a potential client at all. Thus, further inquiry, as directed by the majority, is needed. I do not, however, join part II.B. of the opinion addressing whether the words of a Marshall & Ilsley employee were defamation *per se.*

¶ 16. Before tackling the merits of the majority's defamation *per se* discussion, I make two observations.

¶ 17. First, I question the value of the broad and ill-defined defamation *per se* categories set forth in *Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 113 N.W.2d 135 (1962). I do *not* question the value of having types of defamation that are defamation *per se.* Rather, I question whether all of the categories listed in *Martin* make sense and I am concerned with how poorly defined they are.

¶ 18. Second, I question the legal merit of this particular lawsuit, though not for the reason contained in the majority decision. As the majority points out, the record before us indicates that Freer, through an attorney, hired the person to whom the allegedly defamatory statements were made. Defamation *per se* is an exception to the general rule that a party alleging defamation

736

must also allege special damages. The justification for defamation *per se* is that some false statements are so likely to cause pecuniary loss that " 'proof of the defamation itself is sufficient to establish the existence of some damages so that the jury may, without other evidence, estimate the amount of damages.' " *Bauer v. Murphy*, 191 Wis. 2d 517, 525–26, 530 N.W.2d 1 (Ct. App. 1995) (quoting *Starobin v. Northridge Lakes Dev. Co.*, 94 Wis. 2d 1, 13, 287 N.W.2d 747 (1980)). That being the justification, it seems odd to permit a defamation *per se* claim in a case where it appears undisputed that the statements neither caused, nor could cause, pecuniary loss. If I were writing for the majority, I would explore whether defamation *per se* applies when the audience is a person hired to "test" whether a party will make a defamatory statement. But that topic was not briefed, and I will not venture forth on that path.

¶ 19. I turn now to the reasoning employed by the majority and focus in on the narrow legal reasoning it uses to dismiss Freer's defamation claim.

¶ 20. Freer argues that statements by a Marshall & Ilsley employee were defamatory *per se* because they constituted false statements of fact to a potential client about Freer's relevant experience while employed at Marshall & Ilsley. Freer alleged that when a prospective investment client telephoned Marshall & Ilsley to inquire about Freer's experience with managing investments, the caller was falsely told that Freer had no such experience while at Marshall & Ilsley. This allegation falls squarely into the recognized defamation *per se* category for false statements affecting a plaintiff's profession. *See* RESTATEMENT (SECOND) OF TORTS § 573 cmt. c, at 193 (1977) ("When peculiar skill or ability is neces-

737

sary, an imputation that attributes a lack of skill or ability tends to harm the other in his business or profession.").

¶ 21. The majority does not say that there is a problem with Freer's claim because Sherman was only an *apparent* potential client, not a *real* potential client. And, the majority does not say that giving false information about a person's relevant professional experience to a potential client does not constitute defamation *per se.* Rather, the majority holds that the statements made by the Marshall & Ilsley employee must be viewed in isolation and, when so viewed, the statements are not defamatory *per se* because "many business people undoubtedly fall within the ambit of employment encompassed by [the Marshall & Ilsley employee's] alleged statements to Sherman about Freer and lead proud and productive lives." Majority at ¶ 13. I disagree that the law directs this context-free analysis.

¶ 22. The majority writes: "It is settled in Wisconsin that words are not slanderous *per se* if anything other than the words are needed to make them defamatory." Majority at ¶ 12. The majority goes on to apply this rule so strictly that it does not even take into account the immediate context in which the statements were made. The four cases relied on by the majority in paragraph 12 of its opinion do not support this context-free approach to defamation *per se.*

¶ 23. In *Bauer,* 191 Wis. 2d 517, we were asked to decide whether defamation *per se* occurred when basketball coach Mary Murphy called student-player Amy Bauer a "disgrace" during a team meeting. The *per se* category at issue in *Bauer* was "unchastity" of a woman. Bauer argued that Coach Murphy's "disgrace" statement—viewed in the context of things said by other people at the team meeting—was a declaration

that Bauer was guilty of disgraceful sexual acts with an assistant team coach named Peckham. The majority here seems to say that *Bauer* informs us that we do not look at such context when determining whether a statement is defamatory *per se*. But we did look at context in *Bauer*:

> [W]hile the "chastity" rule is apparently good law, Bauer has not persuaded us that Murphy's "disgrace" remark imputed "serious sexual misconduct" to her within the meaning of the Restatement rule.

> As we have noted above, the only statement specifically relating to a purported "relationship" with Coach Peckham was the announcement to the group by the athletic director, Marra, that Peckham had been suspended for having formed an "inappropriate relationship" with Bauer. Beyond that, the only discussion about Bauer before she entered the meeting took place among her teammates, several of whom were discussing among themselves various occasions on which Bauer and Peckham had been seen together, and some expressing the view that Bauer was "too close" to Peckham. Bauer argues from these facts that Murphy's remark that Bauer was a "disgrace" must be considered as referring to some form of sexual misconduct with Peckham.

> As Murphy points out, however, slander, unlike libel, is an individual, not a joint tort. If Marra's remarks, or the remarks of Bauer's teammates, about her purported relationship with Peckham defamed her, Bauer was free to proceed against them. There is no authority for holding Murphy liable for statements made by others at the meeting, however.

> Nor do we see that the context in which Murphy's remark was made adds a sexual misconduct gloss to her words. First, as the supreme court noted in *Kassowitz v. Sentinel Co.*, 226 Wis. 468, 476, 277 N.W. 177, 180

(1938), " '[w]ords which are defamatory *per se* do not need an innuendo, and, conversely, words which do need an innuendo are not defamatory *per se.*' " (Quoted source omitted.)

. . . .

 *. . . While Murphy's alleged "disgrace" remark was made during a meeting at which the athletic director and several team members were discussing Bauer's relationship with Peckham, it also came in the context of a heated discussion between Bauer and Murphy regarding Bauer's criticism of Murphy's abilities as a basketball coach and the rules Murphy imposed on the team. Indeed, it was after that exchange that Murphy's comment was allegedly made.*

 To be called a "disgrace" is generally disparaging in any context, as the *Bander* court recognized. As the court also recognized, however, it is "equally discreditable as applied to all persons," and we believe in this case that the word does not reasonably carry with it an assertion of "unchastity" or sexual misconduct, *whether taken in isolation or in the context in which the remark was made.*

*Id.* at 528–32 (emphasis added; citations and footnotes omitted). If context does not matter, we should have made quick work of the defamation *per se* claim in *Bauer* because, without the context of the team meeting, Coach Murphy's "disgrace" remark is not even arguably a reference to unchastity. But we obviously thought context did matter, and so discussed it. We certainly did not suggest that context must be ignored when the claim is defamation *per se.*[1]

---

[1] The majority reasons that the *Bauer* court must not have considered the context of the "disgrace" remark because, if consideration of context is permitted to interpret a remark,

¶ 24. The supreme court's decision in *Kassowitz v. Sentinel Co.*, 226 Wis. 468, 277 N.W. 177 (1938), *criticized on other grounds, Martin*, 15 Wis. 2d at 460–61, similarly fails to support the majority's context-free analysis. In *Kassowitz*, the question was whether defamation *per se* occurred when it was stated that a group of persons, including the plaintiff, "are so-called arrested cases of tuberculosis." *Kassowitz*, 226 Wis. at 471, 475–76. The *Kassowitz* court's analysis of whether the statement was defamation *per se* did not turn on whether the statement should be viewed in context. Instead, it turned both on the court's conclusion that tuberculosis is not a "loathsome disease" and its conclusion that the "arrested case" qualifier indicated that the person was not contagious:

> It may be unfortunate, but it is no disgrace to be tubercular. Contracting the disease is not due, as in some cases of disease, to any immorality.

The alleged libelous statement in the instant case

---

then a trial in *Bauer* would have been necessary. The majority states: "If the context of that *discussion* was material, there were, as *Bauer* noted, arguably other things to which the 'disgrace' remark might have referred, including insubordination, and a dispute whether the 'disgrace' remark referred to those other matters or, as the plaintiff argued, the 'inappropriate relationship' discussion, would have required a trial . . . ." Majority at n.3 (citations omitted). I agree that my reading of the *Bauer* decision suggests that a trial should have been ordered. I do not agree that, in *Bauer*, we ignored the meeting when discussing the meaning of "disgrace" or suggested that a defamation *per se* analysis should ignore the context in which a statement is made. In effect, in *Bauer*, we correctly discussed and considered context, but then failed to follow through with the logical next step: ordering factual resolution of what Coach Murphy was referring to when she called Bauer a "disgrace."

741

refers to so-called "arrested cases of tuberculosis." The words, "arrested case," may be defined in a medical way [all "constitutional" symptoms absent], or may be interpreted in the much looser terms of the layman, to whom it may mean an individual well enough to leave a sanitarium and resume his usual existence. It may mean that the person afflicted has so far recovered that he would not communicate the disease to others.

*Id.* at 475.

¶ 25. I note that *Bauer* and *Kassowitz* both say that "innuendo" may not be used to show that words are defamatory *per se, Bauer,* 191 Wis. 2d at 528–32; *Kassowitz,* 226 Wis. at 476–77, but I have a hard time discerning just what is meant by this limitation. Regardless, my review of *Bauer* and *Kassowitz,* and the authorities cited in those cases, does not suggest that the "innuendo" limitation extends to stripping allegedly defamatory words of their immediate context. For example, *Kassowitz* relies on *Shaw Cleaners & Dyers, Inc. v. Des Moines Dress Club, et al.,* 245 N.W. 231 (Iowa 1932), for the proposition that statements that are defamatory *per se* do not need an "innuendo." *Kassowitz,* 226 Wis. at 476. In *Shaw,* a dry cleaner advertised: "Garments Cleaned at Half-Price are only Half Cleaned. When you buy cleaning for half price you get just what you pay for . . . half-way cleaning and pressing." *Shaw,* 245 N.W. at 232. A competing dry cleaner who regularly used "half-price" advertising claimed defamation *per se.* Although the *Shaw* court ultimately determined that the challenged advertisement was not defamation *per se,* the court did consider context along the way. The challenged advertisement in *Shaw* did not name the plaintiff. Only by considering context—that the plaintiff used half-price advertising

742

—could it be known that the target of the statement was the plaintiff. In this respect, the *Shaw* court stated:

> It will be noted that the published advertisement does not name the plaintiff, but it is averred in the petition that the advertisement was a libel of the plaintiff in that the matter printed therein referred to the plaintiff, etc. It is not necessary that the defendant name or directly refer to the plaintiff in the published article in order to constitute libel. [In a previous case we stated]: "A person reading the entire matter said to have been taken from the 'Live Wire' might connect the discussion to and reasonably infer that it referred to ... [the plaintiff] .... *The characterization of a person by insinuation, allusion, imputation, or irony may be quite as certain and effective as though directly applied.* ... And in the case at bar, if the jury should find that plaintiff was intended, there is no escape from the conclusion that the article constituted a libel per se."

*Id.* at 234 (emphasis added; citations omitted). In addition, without saying so, the *Shaw* court necessarily considered the context that the plaintiff is a dry cleaner. Without that backdrop, there was no possible defamation.

¶ 26. The remaining two cases the majority cites are *Holsapple v. Smith*, 599 S.E.2d 28, 33 (Ga. Ct. App. 2004), and *Cook v. Winfrey*, 141 F.3d 322, 329–30 (7th Cir. 1998). As with *Bauer* and *Kassowitz*, neither case discusses whether the context in which a statement is made should be considered. For example, although the *Cook* court quotes an Ohio decision for the proposition that slander *per se* must be "accomplished by the very words spoken," neither *Cook*, nor the Ohio case quoted, *King v. Bogner*, 624 N.E.2d 364, 366 (Ohio Ct. App.

1993), contains any suggestion that the "very words spoken" must be divorced from the context in which they were spoken.

¶ 27. I also think the majority's reliance on examples in RESTATEMENT (SECOND) OF TORTS § 573, comment c, illustrations 1–6, is misplaced. Majority at ¶ 13. Saying that a bricklayer is a hypocrite is not actionable because a perfectly competent bricklayer might also be a hypocrite. In contrast, saying that a lawyer is unqualified to practice law is actionable because it disparages the lawyer's ability as a lawyer. None of the examples from the Restatement address the context issue.

¶ 28. In addition to a lack of legal support, I do not see the common sense in the majority's context-free analysis. If a former employer provides false information about a person's relevant work experience to a prospective client, why not take into account the reason the prospective client called? I wonder whether the majority would ignore context if it provided an innocent interpretation for words that, viewed in isolation, are defamation *per se. See Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1301–02 (Ill. 1996) (" 'We therefore hold that a written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se.*' ")(quoting *Chapski v. Copley Press*, 442 N.E.2d 195, 199 (Ill. 1982)); *see also Babb v. Minder*, 806 F.2d 749, 757 (7th Cir. 1986) (under Illinois' innocent construction rule, "a written or oral statement is to be considered in context").

¶ 29. I cannot join the majority's defamation *per se* discussion because I believe it will be used to defeat

defamation *per se* claims that our supreme court intended to cover when it adopted the *per se* categories. Meaning is commonly derived from context, and I am unable to come up with a good reason to ignore context when deciding whether a statement is defamation *per se.*