Candace BETTENDORF, Bettendorf Transfer Inc., Dunn County, Jackson County, School District of Hudson and Wisconsin Counties Association, Plaintiffs-Respondents-Cross-Appellants,

v.

MICROSOFT CORPORATION, Defendant-Appellant-Cross-Respondent.

Court of Appeals

No. 2008AP3215. *Submitted on briefs November 3, 2009. —Decided December 22, 2009.*

2010 WI App 13

(Also reported in 779 N.W.2d 34.)

140

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of *Jeffrey Morris* and *Kelly H. Twigger* of *Quarles & Brady LLP*, of Milwaukee, and *David B. Tulchin* and *Sharon L. Nelles* of *Sullivan & Cromwell LLP*, of New York, New York.

On behalf of the plaintiffs-respondents-cross-appellants, the cause was submitted on the briefs of *Kelly L. Centofanti* and *Andrew T. Phillips* of *Centofanti Phillips, S.C.*, of Mequon, and *Richard M. Hagstrom, James S. Reece,* and *Michael E. Jacobs, pro hac vice,* of *Zelle Hofmann Voelbel & Mason LLP*, of Minneapolis, Minnesota.

Before Curley, P.J., Kessler and Brunner, JJ.

¶ 1. CURLEY, P.J. Both the appeal and cross-appeal in this matter center primarily on the issue of

attorney fees awarded pursuant to a judgment against Microsoft Corporation (Microsoft). Microsoft argues that the Bettendorf attorneys' attempted deception and lack of candor in their fee petition required the imposition of a significant sanction—namely, the denial of all attorney fees—and that the trial court erred in awarding the Bettendorf attorneys $1.25 million in fees for time spent litigating their fee petition. In contrast, Candace Bettendorf, Bettendorf Transfer, Inc., Dunn County, Jackson County, School District of Hudson, and Wisconsin Counties Association (collectively referred to as Bettendorf using the singular pronoun "she") cross-appeal, arguing that the awards of $4 million in fees in the underlying litigation and $1.25 million in fees and $190,000 in expenses related to the subsequent fee dispute are inadequate.[1]

¶ 2. We conclude that the trial court did not err when it determined that sanctions were not warranted against the Bettendorf attorneys. In addition, we conclude that the trial court acted properly when it reduced both the amount of attorney fees sought by Bettendorf in the underlying litigation and the fees and expenses she sought in the subsequent fee dispute. Finally, with respect to Bettendorf's request for her reasonable attorney fees and costs incurred in successfully opposing Microsoft's appeal, we remand for a hearing before the trial court to determine what, if any, attorney fees

---

[1] Bettendorf does not appeal the award of expenses in the underlying litigation.

Some of the issues in Microsoft's appeal and Bettendorf's cross-appeal overlap. We address the arguments pertaining to the trial court's decisions that are adverse to Microsoft within our discussion of its appeal and the arguments pertaining to the trial court's decisions that are adverse to Bettendorf within our discussion of her cross-appeal.

should be awarded. Accordingly, we affirm the judgment and remand the cause for further proceedings consistent with this opinion.

## I. BACKGROUND.

¶ 3. The appeal and cross-appeal in this matter arise out of antitrust litigation originally filed in St. Croix County Circuit Court in 2003 on behalf of putative classes of indirect purchasers of Microsoft software in the State of Wisconsin. Bettendorf asserted claims under the Wisconsin Antitrust Act based on allegations virtually identical to those asserted in two antitrust class actions that were pending against Microsoft in Wisconsin at the time she filed her lawsuit: *Capp v. Microsoft Corp.* and *Olstad v. Microsoft Corp.* (the *Olstad* case was later recaptioned *Spence v. Microsoft Corp.*), both of which were filed in early 2000.[2] The three actions were subsequently transferred to Milwaukee County.[3]

[2] The lawsuits were filed following the verdict won by the federal government in *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) (findings of fact); 87 F. Supp. 2d 30 (D.D.C. 2000) (conclusions of law), *aff'd in part and rev'd in part,* 253 F.3d 34 (D.C. Cir. 2001). Within five months after issuance of the findings of fact, more than 150 antitrust class actions were filed against Microsoft in state and federal courts around the country on behalf of indirect purchasers of Microsoft software.

[3] The three actions were filed in three separate counties prior to being transferred to Milwaukee County: *Capp v. Microsoft Corp.*, Case No. 00CV637, was filed in Dane County in March 2000; *Olstad v. Microsoft Corp.*, Case No. 00CV3042, was filed in Milwaukee County in April 2000 (the *Olstad* case was recaptioned *Spence v. Microsoft Corp.* in 2005); and *Bettendorf v. Microsoft Corp.*, Case No. 03CV563, was filed in St. Croix County in October 2003. The plaintiffs in the three cases were represented by separate attorneys.

¶ 4. In March 2006, Microsoft and the Spence/ Capp plaintiffs reached a proposed settlement that would have resolved all pending litigation in Wisconsin. The proposed settlement would have provided class members with vouchers worth between $10 and $21 for the purchase of specific hardware and software during the class period. Bettendorf and the Wisconsin Attorney General opposed the proposed settlement. The trial court denied the motion for preliminary approval based on its conclusion that the proposed settlement was inadequate.

¶ 5. Six months later, in September 2006, Microsoft and counsel for the plaintiffs in the three Wisconsin actions agreed to the terms of a proposed settlement pursuant to which Microsoft would provide class members with vouchers in amounts between $10 and $23 and further provided for an additional *cy pres* distribution of vouchers to certain Wisconsin public schools. As a result of the *cy pres* provision, 50% of the difference between claims made and the settlement "face value" was to be distributed to Wisconsin public schools, along with 100% of the value of any claimed, but not redeemed, vouchers. In April 2007, the trial court granted final approval of the settlement.

¶ 6. As part of the settlement, Microsoft agreed to pay the "reasonable attorneys' fees, costs and expenses" of class counsel. Microsoft agreed to pay Spence/Capp counsel a combined fee award of $10.367 million, which reflected a combined lodestar of approximately $3.6 million for work by all timekeepers in both cases (7690 total hours).

¶ 7. In February 2007, the Bettendorf attorneys filed a fee petition seeking an award of attorney fees totaling $22.633 million for 6820 hours of work. In addition, the Bettendorf attorneys sought approximately $1.5 million in costs. Attorney Richard Hagstrom of

Zelle, Hofmann, Voelbel & Mason LLP (Zelle Hofmann), lead counsel for the Bettendorf plaintiffs, submitted an affidavit documenting a lodestar sum, which exceeded the combined lodestar claimed by counsel for the Spence/Capp plaintiffs. Hagstrom averred that he personally reviewed all of the time reflected and that all of the time for which fees were sought "was actually performed on behalf of the putative Wisconsin class and was necessary for the proper representation of such putative class."

¶ 8. Microsoft, believing the Bettendorf lodestar to be too high, propounded discovery requests. In response, the Bettendorf attorneys moved for a protective order. In opposing that motion, Microsoft identified five Zelle Hofmann time entries it had found where the narrative descriptions of work purportedly performed on particular dates did not seem to correspond to activity taking place in any of the three Wisconsin actions. Microsoft alleged that those entries appeared to correspond to events taking place in a different antitrust class action against Microsoft brought by the Zelle Hofmann firm and other attorneys in Iowa on behalf of different plaintiffs asserting claims under Iowa law, *Comes v. Microsoft Corp.*, Polk County District Court Case No. CL-82311. The trial court denied the Bettendorf attorneys' motion, finding that "discovery [wa]s in order to lay bare the facts I need to know to decide what amounts to award in this case."

¶ 9. In April 2007, Bettendorf counsel provided Microsoft with a detailed chart showing how the common benefit time was divided between the Wisconsin and Iowa actions. Microsoft, however, demanded additional materials, including Zelle Hofmann's detailed time records from the entire Iowa case. The Bettendorf attorneys sought a protective order and expressed concern about producing time records that detailed its strategy

145

before and during the approximately three months of trial against Microsoft in Iowa, particularly due to its involvement in ongoing consumer class actions against Microsoft in Canada.

¶ 10. When questioned during Bettendorf's motion for a protective order, Hagstrom acknowledged that the claimed lodestar included "common time" that had been split between the Wisconsin litigation and the Iowa action. Consequently, the trial court denied the Bettendorf attorneys' motion for a protective order, concluding that discovery was necessary and ordering that the Iowa time entries be produced without any redactions unless a particular time entry mentioned strategy related to future litigation. Rather than disclose their Iowa time records, the court allowed the Bettendorf attorneys to later withdraw the Iowa time from their claimed lodestar.

¶ 11. The Bettendorf attorneys' revised lodestar reflected a reduction of more than 1100 hours from the number initially reported to the trial court in February. The Bettendorf attorneys also reduced their request for expenses from $1.5 million to $221,191.87. Despite these reductions, the Bettendorf attorneys continued to request $22.633 million in fees, which reflected an increase in the lodestar multiplier from 6.27 to 7.88.

¶ 12. Microsoft opposed the Bettendorf attorneys' revised fee petition, arguing that the attorneys should not receive an award for their work on the Wisconsin litigation as a sanction for their deception and lack of candor in the February 2007 fee petition. In a memorandum order, the trial court characterized the Bettendorf attorneys' conduct as reflecting a "lack of candor with the court," but excused such behavior as "at worst venial, but definitely not mortal, and does not justify denying their fees altogether." The court went on to

determine that the requested $22.633 million award "cannot be justified in a case like this." Consequently, the court awarded the Bettendorf attorneys fees totaling $4 million plus their uncontested expenses of $221,191.87. In its order, the court permitted the Bettendorf attorneys to brief their request for additional fees for representing themselves in the fee litigation.

¶ 13. In December 2007, the Bettendorf attorneys submitted a new petition seeking an award for the fee litigation of approximately $2.3 million in fees plus $282,518.02 in claimed expenses. The Bettendorf attorneys argued that the fees were justified because of Microsoft's "aggressive litigation tactics," which forced them to spend a substantial amount of time litigating the fee dispute. Microsoft asserted that these tactics were necessary to uncover the Bettendorf attorneys' deception. Moreover, Microsoft opposed the fees-on-fees petition arguing, *inter alia,* that the amount sought was unreasonably excessive.

¶ 14. The trial court subsequently issued a sixty-six page decision and order expounding on its reasoning for awarding the Bettendorf attorneys $4.2 million in fees and expenses in the underlying litigation and ruling on the Bettendorf attorneys' request for additional fees incurred in representing themselves in the fee litigation. With respect to the request for additional fees arising out of the fee litigation, the court concluded that "a significant portion of the briefing and other proceedings in court could have been avoided if Microsoft had not pursued its ethics concern so militantly." The court found it was reasonable for Microsoft to pay the Bettendorf attorneys $1.25 million for fees and $190,000 for expenses. Microsoft now appeals and Bettendorf cross-appeals. Additional facts are set forth in the remainder of this opinion.

## II. Analysis.

*Standard of review.*[4]

██

¶ 15. "A trial court's decision whether to impose sanctions . . . and what sanction to impose, is committed

---

[4] Microsoft did not provide the standard of review in its appellate briefs. However, in its docketing statement, Microsoft presented the standards of review on the issues it raises as follows:

> The first issue is whether the [Trial] Court's decision to award plaintiffs' lawyers attorneys' fees and expenses totaling $4.2 million for their work on the underlying litigation notwithstanding their acknowledged "lack of candor" was erroneous as a matter of law. As such, this is a question of law and the standard of review is *de novo. See, e.g., Landwehr v. Landwehr*, 2006 WI 64, [¶ ]8, 291 Wis. 2d 49, 715 N.W.2d 180 (whether the [trial] court applied the correct legal standard is a question of law that is reviewed de novo).

> The second issue is whether the [Trial] Court applied the correct legal standard in awarding the plaintiffs' lawyers an additional $1.4 million for representing themselves in connection with the fee litigation notwithstanding their lack of candor in prosecuting that fee petition. As such, this is a question of law and the standard of review is *de novo. See, e.g., Landwehr v. Landwehr*, 2006 WI 64, [¶ ]8, 291 Wis. 2d 49, 715 N.W.2d 180.

> The third issue is whether the [Trial] Court's award of $1.4 million in attorneys' fees for the work of plaintiffs' lawyers in representing themselves in the fee litigation was unreasonably excessive in view of the amounts at issue and the result obtained in that fee litigation. As such, the standard on appeal is whether the [trial] court erroneously exercised its discretion. *See Kolupar v. Wilde Pontiac Cadillac, Inc.*, [2004 WI 112], 275 Wis. 2d 1, 683 N.W.2d 58.

(Some italics added.) As to the first issue, we note that Microsoft did not argue in its brief that the trial court erred in its award of expenses related to the underlying litigation. Because Microsoft did not address the issue, we deem it abandoned. *See Post v. Schwall*, 157 Wis. 2d 652, 657, 460 N.W.2d 794 (Ct. App. 1990) ("Arguments raised but not briefed or argued are deemed

148

to the trial court's discretion." *Garfoot v. Fireman's Fund Ins. Co.*, 228 Wis. 2d 707, 717, 599 N.W.2d 411 (Ct. App. 1999). "Accordingly, we will affirm the trial court's decision if it examined the relevant facts, applied a proper standard of law, and reached a reasonable conclusion." *Teubel v. Prime Dev., Inc.*, 2002 WI App 26, ¶ 15, 249 Wis. 2d 743, 641 N.W.2d 461. Our review of the various factual findings made by the trial court in arriving at its determination is limited in that the court's "[f]indings of fact shall not be set aside unless clearly erroneous." *See* Wis. Stat. § 805.17(2) (2007–08).[5]

¶ 16. As to the trial court's award of attorney fees related to both the underlying litigation and the fee dispute, we again employ a deferential standard of review:

> When a [trial] court awards attorney fees, the amount of the award is left to the discretion of the court. We uphold the [trial] court's determination unless the [trial] court erroneously exercised its discretion. We give deference to the [trial] court's decision because the [trial] court is familiar with local billing norms and will likely have witnessed first-hand the quality of the service rendered by counsel. Thus, we do not substitute our judgment for the judgment of the [trial] court, but instead probe the court's explanation to determine if

abandoned by this court."). In addition, notwithstanding Microsoft's efforts to cast as legal issues (in order to secure a *de novo* standard of review) the trial court's discretionary determinations that sanctions against the Bettendorf attorneys were not warranted and that the Bettendorf attorneys were entitled to an award of fees for representing themselves in the fee litigation, we are not persuaded.

[5] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

the court "employ[ed] a logical rationale based on the appropriate legal principles and facts of record."

*Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2004 WI 112, ¶ 22, 275 Wis. 2d 1, 683 N.W.2d 58 (*Kolupar I*) (citations omitted). As the ones seeking to be paid, the Bettendorf attorneys bear the burden of demonstrating the reasonableness of their fees. *See id.*, ¶ 34. "We will uphold the [trial] court's determination unless it erroneously exercised its discretion. 'If the [trial] court proceeds on an erroneous interpretation of the law, the exercise of discretion is erroneous.' " *Anderson v. MSI Preferred Ins. Co.*, 2005 WI 62, ¶ 19, 281 Wis. 2d 66, 697 N.W.2d 73 (citations omitted). This same standard applies to our review of a trial court's award of costs. *Id.*

A. *Microsoft's appeal.*

1. *The trial court properly determined that sanctions were not warranted against the Bettendorf attorneys.*

¶ 17. Microsoft contends that the trial court should have sanctioned the Bettendorf attorneys for their attempted deception and lack of candor. In support of its contention that sanctions were warranted against the Bettendorf attorneys, Microsoft makes several arguments. First, Microsoft directs our attention to what it describes as a "false and misleading" representation made by Hagstrom in his affidavit to the effect that all of the time reflected in the lodestar sum "was actually performed on behalf of the putative Wisconsin class and was necessary for the proper representation of such putative class."

¶ 18. The reality, according to Microsoft, is that the Bettendorf attorneys' claimed lodestar sum included

150

more than 1100 hours spent by the Zelle Hofmann attorneys while they were litigating a class action against Microsoft in Iowa, brought on behalf of a class separate from that represented in the Bettendorf litigation—a fact that was not disclosed in the fee petition or in the supporting papers filed with the trial court. According to Microsoft, because Zelle Hofmann received an award of $75 million for its fees and expenses related to work performed in the Iowa action, "any fee award in Wisconsin for work done in the Iowa action would have resulted in Microsoft paying twice—once in Iowa and once in Wisconsin—for the exact same work." Microsoft asserts that the Bettendorf attorneys' sanctionable conduct cannot be remedied by their after-the-fact disclosure of the truth surrounding their representations to the court and the withdrawal of their initial requests for compensation related to Iowa time. Microsoft argues: "If this were the case, . . . no ethical violation would *ever* be sanctionable provided the lawyer is smart enough to 'come clean' once caught."

¶ 19. Next, Microsoft takes issue with what it describes as extensive alterations of the time records used to support the lodestar by the Bettendorf attorneys whom it contends "(i) fabricat[ed] dozens of new entries and (ii) chang[ed] the narrative descriptions in hundreds of other entries." Microsoft's criticisms specifically relate to time entries "created to make it appear that a purported meeting occurred when there was a discrepancy among time keepers," and the removal of descriptions from time entries for work that it contends is often considered nonbillable such as time related to the Bettendorf attorneys' travel, obtaining a conflict waiver, researching their own attorney fees, and "wrangling with the lawyers in other cases over lead counsel appointment."

¶ 20. Microsoft cites *Office of Lawyer Regulation v. Winkel*, 2005 WI 165, 286 Wis. 2d 533, 706 N.W.2d 661 (per curiam), as support for its position that the Bettendorf attorneys' misrepresentations, "including their extensive alterations and fabrications of time entries, are precisely the kinds of acts that constitute sanctionable misconduct." In *Winkel*, our supreme court concluded that an attorney engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of SCR 20:8.4(c) where the attorney reconstructed time entries in a fee application, which more than doubled the amount of time reflected on the initial time slips submitted by the attorney's associate, without adequately explaining why he increased the associate's time entries. *Winkel*, 286 Wis. 2d 533, ¶ 21.

¶ 21. Microsoft submits: "There can be no doubt that the Bettendorf lawyers' representations in their February 2007 fee petition violated both their ethical duty of candor to the court and their duty to refrain from deceit, dishonesty and misrepresentation." (Italics omitted.) *See* SCR 20:3.3(a)(1); SCR 20:8.4(c).[6] Despite

---

[6] Chapter SCR 20, which sets forth the rules of professional conduct for attorneys, was repealed and recreated effective July 1, 2007. *See* SUP. CT. ORDER 04–07, 2007 WI 4, 293 Wis. 2d xv (eff. July 1, 2007). When the Bettendorf attorneys submitted their fee petition in February 2007, the version of SCR:20:3.3 that was in effect, captioned "**Candor toward the tribunal**," provided in relevant part: "**(a)** A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal." It presently bears the same caption and reads: "**(a)** A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." SCR:20:3.3(a)(1) (eff. July 1, 2007). The relevant language in SCR 20:8.4 captioned "**Misconduct**," was not affected by the repeal and recreation of ch. SCR 20 and provides: "It is

what Microsoft portrays as an overt violation of the Bettendorf attorneys' ethical duties, the trial court did not sanction them. Microsoft argues that the trial court's refusal to impose a sanction was based on its erroneous belief that the appropriate test of whether an alleged lack of candor deserves a litigation sanction was whether anyone was actually deceived.

¶ 22. According to Microsoft, the test the trial court employed "would effectively eviscerate the 'duty of candor' owed to the court." (Citing 20:3.3(a)(1).) In support of its argument, Microsoft asserts that if the test were as stated by the trial court, a virtually insurmountable hurdle would block the way to obtaining sanctions against the party engaged in deception in that where the deception goes undetected, the offender would not be sanctioned, and yet, if the attempted deception is discovered, an award of sanctions likewise could be avoided because the scheme failed. By removing the threat of sanctions, Microsoft continues, attorneys "would have every incentive to inflate their fee requests and leave defendants with no choice but to pursue aggressive discovery to ensure that neither they nor the court are being deceived." It is for these reasons and for the integrity of the legal system as a whole that Microsoft contends sanctions must be imposed for misleading conduct and/or conduct reflecting a lack of candor irrespective or whether the court or opposing counsel are deceived.

¶ 23. Our review of the record reveals, as Microsoft points out, that the trial court, in discussing

professional misconduct for a lawyer to: **(c)** engage in conduct involving dishonesty, fraud, deceit or misrepresentation." SCR 20:8.4(c) (eff. July 1, 2007). We rely on the versions of these Rules in effect when the Bettendorf attorneys submitted their petition.

153

Microsoft's allegations pertaining to a lack of candor on the part of the Bettendorf attorneys, wrote in its decision: "[T]he best test of whether an alleged lack of candor deserves a litigation sanction . . . is whether anyone was actually deceived." The context in which the aforementioned statement was made was as follows:

I have reviewed the suspect time entries, and have these three reactions. First, neither I nor Microsoft w[as] deceived by them. These entries, as generic and as unassuming as they may seem standing alone, do not stand alone; they are found in the context of many other time entries, and in an even greater context of correspondence, pleadings and proceedings in this case. From that greater context, in which Microsoft's own attorneys were at work, it was easy enough for Microsoft to tell whether the time entry was reasonable and necessary. Microsoft detected, identified and inventoried the alleged concealments soon after reviewing the Bettendorf attorneys' bills and was quick to complain about them.

For example, it was not difficult for Microsoft to detect that the Bettendorf attorneys were seeking to recover for obtaining conflict waivers after Attorney Natalie Remington left the Stadler, Centofanti & Philips firm [one of the firms representing Bettendorf] to work for Quarles & Brady [one of the firms representing Microsoft]. Likewise, it was not difficult to surmise that references to travel time had been excised, or to detect that the Bettendorf attorneys were seeking compensation for work performed in preparing the *Comes* case in Iowa for trial (for example, by preparing for and taking and defending depositions of witnesses slated to testify in that case), or to detect that the Bettendorf attorneys were seeking payment of the fees they incurred seeking their fees in this case. Laying the Bettendorf time entr[i]es alongside the time entries for Microsoft's attorneys would reveal most if not all of these alleged concealments.

154

I agree with Microsoft that, when the billing statements the Bettendorf lawyers submitted to the court are compared with the raw, unedited time entries, it may appear that the Bettendorf lawyers made certain entries appear more generic, as if to conceal the work that actually was performed. But seeing how revealing these entries are in the context of the bills as a whole, in the litigation as a whole, I must disagree with Microsoft's contention that "this after-the-fact fabrication of time entries without disclosing the manufactured nature of such entries to the Court would, in and of itself, constitute a serious ethical violation." This case is hardly on par with [*Winkel*, 286 Wis. 2d 533], invoked by Microsoft, in which the attorney who was disciplined was caught more than doubling the firm's contemporaneous time entries, and could offer no adequate explanation. *Id.*, ¶ 18.

Second, the edits strike me, based on my experience as a former timekeeper, bill editor and litigation manager/bill reviewer, as within the range of normal bill editing in which lawyers engage. Lawyers rarely issue a bill in unedited form. It is common for lawyers to reconcile inconsistent time entries and repair apparent discrepancies by creating and editing time entries that may not have captured all the work that actually was performed. A perfect example occurs when a brief office conference takes place and one timekeeper records it but another fails to. If persuaded that the conference actually took place and that both timekeepers were present, the bill editor may well create a time entry for the timekeeper who failed to keep a contemporaneous record of the conference. I find no reason to doubt that the entries "manufactured" by the Bettendorf lawyers . . . represent[ed] time actually devoted to the case by the Bettendorf lawyers.

(Record citation and some italics omitted.)

¶ 24. As its final point in rejecting Microsoft's argument that sanctions were warranted, the court stated:

> Third, the Bettendorf attorneys were so open about the information they supposedly concealed, and relatively quick to withdraw some of their .claims, that I consider fully mitigated any conduct, deliberate or inadvertent, of the Bettendorf attorneys that may have impeded the proceedings in this court. The Bettendorf lawyers invited Microsoft to sit down and answer questions about the work they did and covered by the bills, and they submitted detailed descriptions of the time that they were withdrawing. This candor absolves any doubts that I might reasonably have about any appearance of a lack of candor that arises from the edited time entries.
>
> I do not mean to suggest that we do not expect candor from the bar. I agree with Microsoft and its distinguished ethics expert, Professor Charles Wolfram of Cornell Law School, that both the integrity of the judicial system generally, and of the fee award process in particular, depend heavily on candor. The court and opposing parties depend on the party seeking fees to be forthright, because the "relevant information—i.e., the amount of time particular lawyers spent on particular tasks on a given day—is uniquely in their control." Judicial tolerance of serious misrepresentation would undermine the capacity of all courts to function efficiently and seriously prolong and complicate proceedings such as this.
>
> But the best test of whether an alleged lack of candor deserves a litigation sanction (as opposed, say, to the sanctions available in professional responsibility matters through the Office of Lawyer Regulation, which are not mine to impose or withhold) is whether anyone was actually deceived. In fact, nothing "slipped

by" Microsoft or the court. Nor was it necessary for Microsoft to "go to great lengths to get the facts that exposed the misleading nature" of the time entries it has highlighted for my review. A simple comparison of the Bettendorf bills with its own lawyers' bills was all it took. Thus, I conclude that the Bettendorf attorneys' apparent lack of forthrightness was venial at worst and has been expiated by its complete openness about those time entries, combined with its willingness to simply withdraw the request for reimbursement of them.

(Record citations and italics omitted.)

¶ 25. Microsoft argues that the test employed by the trial court to determine whether an alleged lack of candor warrants a litigation sanction was in error and directs us to cases where courts have awarded sanctions without requiring a showing of deception. The only Wisconsin case Microsoft cites to support its argument is *Freer v. M & I Marshall & Ilsley Corp.*, 2004 WI App 201, 276 Wis. 2d 721, 688 N.W.2d 756, which, as Microsoft argues, contains "no suggestion . . . that either opposing counsel or the trial court were actually deceived by the misstatements or that sanctions would be inappropriate absent actual deception." In *Freer*, we were "disturbed" by the fact that the complaint asserted things that conflicted with the summary judgment evidentiary record, *id.*, ¶ 5; consequently, we remanded the matter to the trial court for a hearing to resolve the inconsistencies and "depending on its findings, to impose under [Wis. Stat. §] 802.05(1)(a) any sanction that in the exercise of its reasoned discretion it believes is appropriate," *Freer*, 276 Wis. 2d 721, ¶ 6.

¶ 26. While the *Freer* court, which addressed conflicting assertions made in a summary judgment posture, may not have focused on actual deception, this

does not support the conclusion that the trial court in this case erred. Instead, we view the trial court's test as a reflection of its assessment of the nature of the alleged misconduct at issue. We are not convinced that the trial court's consideration of "whether anyone was actually deceived" under the circumstances of this case will eviscerate the duty of candor owed to the court, as Microsoft predicts, given that the determination remains a discretionary one to be resolved by trial courts on a case by case basis. *Garfoot*, 228 Wis. 2d at 717 ("A trial court's decision whether to impose sanctions . . . and what sanction to impose, is committed to the trial court's discretion.").

¶ 27. Here, the trial court, in a detailed decision spanning sixty-six pages (supplementing its prior twelve-page memorandum order), related the evidence of record and reasonably concluded that the Bettendorf attorneys had not breached their duties under SCR 20:3.3(a)(1) and SCR 20:8.4(c). *See Teubel*, 249 Wis. 2d 743, ¶ 15 ("[W]e will affirm the trial court's decision [on the issue of sanctions] if it examined the relevant facts, applied a proper standard of law, and reached a reasonable conclusion."). We agree with the trial court that the conduct at issue in *Winkel* is of an entirely different nature than that presented in the case before us, particularly where the edits at issue here were found by the trial court to fall "within the range of normal bill editing in which lawyers engage." *See Kolupar I*, 275 Wis. 2d 1, ¶ 22 (noting the familiarity of trial courts with local billing norms). The trial court's findings are not clearly erroneous; as such, we will not disturb them and will uphold the trial court's determination that sanctions were not warranted against the Bettendorf attorneys.[7]

---

[7] In the context of its argument that the appropriate sanction was a denial of all attorney fees for what it describes as

*2. The trial court did not err in awarding the Bettendorf attorneys their fees for time spent litigating their fee petition.*

¶ 28. Next, Microsoft challenges the trial court's decision to award the Bettendorf attorneys an additional $1.25 million for representing themselves in the fee litigation that ensued.[8] As a preliminary matter, Microsoft does not dispute the court's authority to award fees-on-fees. *See Thompson v. Village of Hales Corners,* 115 Wis. 2d 289, 309, 340 N.W.2d 704 (1983) (relying on Seventh Circuit precedent for the proposition that " 'a prevailing plaintiff's entitlement to fees for the effort entailed in securing compensation has been unanimously upheld [by those courts that have addressed the issue]' ") (citation omitted). Instead, Microsoft challenges the court's decision to award the Bettendorf attorneys' their fees incurred in representing themselves in the fee litigation under the circumstances presented.

¶ 29. In *Kolupar I,* the court set forth the legal principles to be applied in determining whether a fee is appropriate, starting with the factors set forth in SCR 20:1.5(a), which are:

---

the Bettendorf attorneys' attempted deception and lack of candor, Microsoft takes issue with the multiplier used by the trial court to increase the size of the fee award recovered by the Bettendorf attorneys. We will discuss this issue in the context of Bettendorf's cross-appeal.

[8] Microsoft does not challenge the trial court's award of costs incurred by the Bettendorf attorneys in the fee litigation. Bettendorf sought $282,518.02 in expenses, of which the trial court awarded $190,000. Bettendorf requested fees of approximately $2.3 million related to the fee litigation. Bettendorf cross-appeals the reduction of both her fees and her expenses related to the fee litigation, which we discuss later in this opinion.

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

SCR 20:1.5(a) (eff. July 1, 2007); *see also Kolupar I*, 275 Wis. 2d 1, ¶ 24 ("[T]his court has endorsed the factors set out in SCR 20:1.5 and encourages courts to apply these factors when they are required to determine or evaluate attorney fees."). Our supreme court in *Kolupar I* acknowledged: "Admittedly, the [SCR 20:1.5] factors are often quite subjective. Therefore the results are open to significant variation. The factors do not lead to a single unitary value as the only reasonable fee. They can justify a range of reasonable fees and different methods of calculating them." *Kolupar I*, 275 Wis. 2d 1, ¶ 26.

¶ 30. With the goal of making the discretionary fee determination "more uniform and transparent," *Kolupar I* set forth an objective framework for courts to assess the SCR 20:1.5 factors. *Kolupar I*, 275 Wis. 2d 1, ¶¶ 27–30. "In *Kolupar [I]*, [our supreme court] adopted

the lodestar approach for determining reasonable attorney fees in fee-shifting statutes. Under this analysis, the [trial] court must first multiply the reasonable hours expended by a reasonable rate. The [trial] court may then make adjustments using the SCR 20:1.5(a) factors." *Anderson*, 281 Wis. 2d 66, ¶ 39 (citing *Kolupar I*, 275 Wis. 2d 1, ¶¶ 29–30).

¶ 31. Here, the trial court relied on a lodestar analysis coupled with its consideration of SCR 20:1.5(a) factors. First, the trial court separated the time entries related to the fee litigation into four categories to arrive at a "rough assessment" of how much time was spent on each of the following: "(1) the preparation of the fee request itself; (2) responding to discovery and defending against the alleged aggressive litigation tactics; (3) engaging in in-kind aggressive counter-tactics; and (4) preparing the mother of all reply briefs, and the accompanying affidavits."[9] The court then broke down the Bettendorf attorneys' time giving the following approximations: less than 15% was spent preparing the original fee petition and related filings; 40% "was spent responding to discovery initiated by Microsoft, in related court proceedings provoked by that discovery and in discovery of Microsoft's ethics experts"; 20% "was spent launching discovery against Microsoft that was not necessary except to respond in-kind to the discovery initiated by Microsoft"; and the remaining 25% was spent on the reply in support of the fee petition, which "consisted of one part reaction to Microsoft's aggressive tactics and four parts full court press by the Bettendorf attorneys in support of their ambitious fee request." (Italics omitted.)

---

[9] The reply brief apparently consisted of 141 pages and was accompanied by more than 6300 pages of simultaneously filed supporting affidavits and exhibits.

¶ 32. From this breakdown, the trial court concluded that not all of the Bettendorf attorneys' time was necessary or reasonable, finding: "[f]irst, if the fee request was less ambitious, the Herculean effort put into the briefing would not have been necessary," and second, although a substantial amount of the fees incurred were justified by the discovery provoked by Microsoft, "[c]onsiderable time was spent conducting discovery of Microsoft's lawyers and their tactics, most of which struck me as more strategy than substance." The court referenced the depositions taken of Microsoft's lawyers, which "bore little fruit, [as] could have been predicted even before they were commenced," in support of its finding that roughly one-third of the time invested by the Bettendorf attorneys related to the fee litigation could have been avoided.

¶ 33. Consequently, the trial court cut 1500 hours (approximately one-third) from the time for which the Bettendorf attorneys sought to recover fees and likewise reduced their related expenses by one-third. Despite these reductions, the court found:

> On the other hand, a substantial amount of the work performed by the Bettendorf lawyers was the result of Microsoft's hardball demand that these lawyers be paid nothing, which demand was premised on an ethics issue that, if valid at all, was minor. I believe that a considerable amount of the discovery in the case and a significant portion of the briefing and other proceedings in court could have been avoided if Microsoft had not pursued its ethics concern so militantly.

(Italics omitted.) In light of these findings, we are not persuaded that the trial court's approval of 3100 hours for fee litigation was "*per se* unreasonable" as challenged by Microsoft.

¶ 34. The trial court went on to conclude that a blended average rate of $400 per hour was appropriate.[10] Thus, after multiplying 3100 hours by $400/hour, the court arrived at the challenged lodestar value of approximately $1.25 million. It also found that no adjustment to the lodestar was warranted.

¶ 35. Microsoft argues that the trial court erred in awarding fees in light of its ethics allegations because the award entitled the Bettendorf attorneys to compensation "for resisting Microsoft's discovery efforts and attempting to defend their own misleading representations and lack of candor to the court." However, because we have already concluded that the trial court properly determined that sanctions were not warranted for the ethics allegations, we are not convinced by Microsoft's argument that the trial court should have relied on those same alleged ethics allegations to deny the Bettendorf attorneys the fees requested in the fee litigation.

¶ 36. Furthermore, we are not persuaded by Microsoft's contention that it was placed in a no-win situation in that "[i]f it fails to pursue vigorous discovery, it risks that the court will award inflated fees based on a misleading fee petition. But if it pursues discovery, it risks, as happened here, that it must pay two sets of lawyers." Microsoft's actions in this case cannot be properly described as vigorous discovery; rather, the court was faced with "Microsoft's hardball demand that [the Bettendorf attorneys] be paid nothing . . . premised on an ethics issue that, if valid at all, was minor," coupled with Microsoft's "militant[]" pursuit of that

---

[10] How the trial court arrived at this $400 per hour rate is discussed in detail in the context of Bettendorf's cross-appeal.

same ethics concern. We do not find error in the trial court's decision to hold Microsoft responsible for the consequences of its actions and are persuaded by the cases cited by the Bettendorf attorneys in this regard. *See, e.g., Wolf v. Frank*, 555 F.2d 1213, 1217 (5th Cir. 1977) ("Obviously, the more stubborn the opposition the more time would be required, so that counsel received their compensation for the extra effort thus required."); *Perkins v. New Orleans Athletic Club*, 429 F. Supp. 661, 667 (E.D. La. 1976) ("Those who elect a militant defense . . . must take into account the time and effort they exact from their opponents.").

¶ 37. Next, Microsoft argues that the trial court erroneously exercised is discretion by awarding the Bettendorf attorneys $1.25 million when those attorneys obtained less in fees than what they could have obtained in a settlement. Microsoft points to the fact that its counsel "stood in open court" and offered $5 million to settle the Bettendorf attorneys' claim for attorney fees; consequently, Microsoft argues "[h]ad the Bettendorf lawyers accepted Microsoft's settlement proposal at that time—which was $1 million more than the award they ultimately obtained—all fee litigation could have been avoided." (Italics omitted.) The court, however, which heard the offer first-hand, concluded "nascent settlement attempts like these are not sufficiently firm for me to conclude that the Bettendorf attorneys turned away from an opportunity that would have definitely avoided these proceedings . . . ." (Italics omitted.) We are in no position to disagree with the court's assessment on this point.[11] Moreover, we are not per-

---

[11] The trial court did, however, give Microsoft credit for this settlement offer by taking into account "Microsoft's willingness to discuss settlement of the claim at an early point in these

suaded that simply comparing the amount of the settlement offer with the amount ultimately recovered by Bettendorf is dispositive. *See Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2007 WI 98, ¶ 55, 303 Wis. 2d 258, 735 N.W.2d 93 (*Kolupar II*) (addressing a request for costs pursuant to a fee-shifting statute and noting: "What is not relevant to the reasonableness of an award of costs, however, is the pecuniary value of the action as compared with the costs of litigation.").

¶ 38. That Microsoft wishes the court had analyzed the SCR 20:1.5(a) factors—which "do not lead to a single unitary value as the only reasonable fee [and] can justify a range of reasonable fees and different methods of calculating them," *see Kolupar I*, 275 Wis. 2d 1, ¶ 26—differently, is not enough to compel us to conclude that the award reflects an erroneous exercise of the court's discretion. Rather, given that the trial court " 'employ[ed] a logical rationale based on the appropriate legal principles and facts of record,' " *see id.*, ¶ 22 (citation omitted; brackets in *Kolupar*), we uphold the trial court's award of fees related to the fee litigation, *see Anderson*, 281 Wis. 2d 66, ¶ 19.[12]

*3. Bettendorf's request for reasonable attorney fees and costs incurred in successfully opposing Microsoft's appeal.*

¶ 39. Bettendorf claims she is entitled to her reasonable attorney fees and costs incurred on appeal. Microsoft does not address Bettendorf's requests for reasonable attorney fees and costs in its reply brief;

proceedings," in concluding that applying a multiplier to the lodestar, which would have further enhanced the fee award, was not warranted.

[12] We address whether the amount of the award was appropriate in the context of Bettendorf's cross-appeal.

165

consequently, we remand for a hearing before the trial court to determine what, if any, attorney fees should be awarded.

*B. Bettendorf's cross-appeal.*

*1. The trial court properly analyzed the value of the settlement.*

¶ 40. Bettendorf attacks the trial court's analysis of her request for fees arising out of the underlying litigation on a number of bases, one of which is her contention that the court erroneously minimized the value of the settlement, making its analysis under SCR 20:1.5(a)(4) ("the amount involved and the results obtained") improper. She takes issue with the court's assessment of the settlement as set forth in its written decision, which reads:

> [T]he recovery in this case is not as generous as it may seem at first blush. At the end of the day, the recovery consists of coupons, not cash. The coupons aren't worthless, of course. They are useful for a wide variety of computer hardware and software, and not just Microsoft's. But the coupons are not very large (for example, if a member of the class bought the Windows 98 Office suite, he or she is entitled to a coupon worth $23.00). As a result, a large percentage of the lucky winners in this case aren't expected to even claim their prizes. If the prize is so unalluring, paying a large bonus to their lawyers seems hard to justify. The Bettendorf attorneys deserve some credit for engineering a settlement that, through the *cy pres* distributions, confers a sizeable sum on our state's neediest schools, and so they should not be denied a bonus altogether, but it is not as though the Bettendorf attorneys put hundreds of millions of dollars in class members' pockets.

(Italics omitted.)

166

¶ 41. According to Bettendorf, in arriving at its conclusions as to the value of the settlement, the court: "ignored the only empirical dat[a] about the claims made in Wisconsin," such that it understated Microsoft's expected payout to the Wisconsin class; disregarded the Bettendorf attorneys' outreach efforts; and applied discounts that were not based on evidence of record to support its conclusion that the value of the settlement was between $70 and $100 million.

¶ 42. The September 2006 settlement had a "face value" of approximately $224 million, which was the maximum value of the deal if all eligible class members made claims. When the Bettendorf attorneys made their final fee petition, the claims period had closed; however, the final value of the claims was then unknown. Later it was established that Microsoft will pay claimants between $62.8 and $66.8 million. As a result of the *cy pres* provision, 50% of the difference between claims made and the settlement "face value" was to be distributed to Wisconsin public schools, along with 100% of any claimed, but not redeemed, vouchers. In the end, Microsoft's *cy pres* payout to Wisconsin public schools will total approximately $78.5 million, and its total payout to the Wisconsin class will be $141.4 to $145.4 million ($78.5 million plus between $62.8 and $66.8 million). Bettendorf argues that there is no justification for discounting the settlement below its actual cost to Microsoft.

¶ 43. The trial court analyzed the fee request, beginning with the lodestar method, as mandated by *Kolupar I. See id.*, 275 Wis. 2d 1, ¶¶ 29–30. As part of its analysis, the court determined that of the almost 5700 hours for which the Bettendorf attorneys sought recovery, 5500 were reasonably spent litigating the underlying action. The court's reasoning for the reduc-

167

tion was that "[s]ome of the work performed was of marginal value, including jockeying over where the case would be venued (ostensibly on grounds that consolidation might trigger removal, a remote possibility at best) and filing the *amicus* brief in the Supreme Court in the *Olstad* appeal." The court then determined a reasonable hourly rate for the Bettendorf attorneys after taking into consideration that the rates claimed by the Bettendorf attorneys ranged from $250 to $750 per hour, and that the Bettendorf attorneys did not do a reasonable job of delegating work, with approximately 25% of the time reflected in the lodestar being performed by two attorneys whose time was charged at the top rate of $750 per hour, while the blended rate for Spence/Capp counsel was approximately $420. The court concluded "that a blended rate of about $400.00 per hour is not unreasonable given the stakes in a case like this. I consider this a premium rate, far higher than the $250 and $300 per hour rates that prevail among the elite defense attorneys in town . . . ." (Footnote omitted.)

¶ 44. Lastly, the trial court determined that a multiplier was warranted—though not one as generous as the Bettendorf attorneys sought (they sought a multiplier of 7.88, which the court described as "stratospheric" in that "[i]t would yield a fee with an effective hourly rate of $4,000 per hour or more").[13] Among other things, the court considered the range of approved multipliers in other Microsoft indirect purchaser class actions (in California, the multiplier was about 2 and in Minnesota it was 2.5) before concluding that an appropriate multiplier in this case fell within a range of

[13] The trial court explained, and neither party disputes on appeal, that "[i]f a lawyer's work yields extraordinary results, the court has the power to award a bonus, which usually is expressed as a multiple of the lodestar ('the multiplier')."

168

between 1.5 and 2. To support its conclusion, the court accounted for Microsoft's willingness to pay a bonus to other attorneys in other class actions, credited the Bettendorf attorneys for objecting to the original settlement and for their "preparedness and polish," and recognized the risks of nonpayment the Bettendorf attorneys faced at the outset of the case (i.e., prior to our supreme court's decision in *Olstad v. Microsoft Corp.*, 2005 WI 121, 284 Wis. 2d 224, 700 N.W.2d 139).

¶ 45. Taking these findings into effect, the trial court concluded that the resulting lodestar sum amounted to $2.2 million (5500 hours multiplied by an hourly rate of $400), which, when enhanced by a multiplier of either 1.5 or 2, resulted in a fee of $3.3 to $4.4 million. The court then proceeded to a percentage-of-the-recovery analysis.[14]

¶ 46. The trial court began with an assessment of the credit owed to the Bettendorf attorneys for securing the settlement. It found that only 25% was attributable to their efforts, whereas "[t]he two events that played by far the largest role in the settlement of this case" were (1) our supreme court's decision in *Olstad*, which permitted this lawsuit to go forward; and (2) the

---

[14] After initially considering the lodestar approach, the trial court found that it was appropriate to consider the percentage-of-the-recovery approach, which it described as "not being driven by the amount of the attorney's work but by the amount of the results [whereby t]he court simply measures the amount that was won for the client and awards the lawyer a fair share, expressed as a percentage of the sum that was won." The court deemed SCR 20:1.5(a)(4) to be "a paraphrase of sorts of the percentage-of-the-recovery method," and neither party challenges this conclusion on appeal. For purposes of this cross-appeal, we assume without deciding that this is correct.

precursor settlement of the nearly identical Minnesota lawsuit, "which set a fairly irresistible mark for this case to meet or exceed."

¶ 47. Upon considering a myriad of factors, benchmarks (including that "[i]n these Microsoft indirect purchaser class actions, the three biggest face value settlements—in California, New York and Florida— resulted in fee awards that were only 4.7% to 9.2% of the settlement face value"), and case studies, the trial court concluded that the appropriate percentage to use was 7.5%. The key considerations it relied upon were its determinations that the face value recovery in this case was large, thus warranting a lower percentage, that the amount of the recovery was not extraordinary given the obvious benchmark set by the Minnesota settlement, and that the risk of nonpayment of the Bettendorf attorneys was low given the likelihood that settlement would ensue since similar cases in other states settled.

¶ 48. The court then multiplied the face value of the settlement ($224 million) by the percentage it had arrived at (7.5%) and awarded the Bettendorf attorneys 25% of that result (based on its conclusion the Bettendorf attorneys deserved 25% of the credit for the settlement). The amount the court arrived at was approximately $4.2 million, which was in line with the fee suggested by the court's lodestar analysis. After rounding its results to a whole number, the court concluded that the Bettendorf attorneys should be paid $4 million in fees. Upon considering the remaining SCR 20:1.5(a) factors, the court found that no adjustment to the fee award was required.

¶ 49. Bettendorf argues that the trial court's discount of the value delivered by her counsel was erroneous under SCR 20:1.5(a)(3) ("the fee customarily

170

charged in the locality for similar legal services"). Citing numerous cases reflecting a range of recoveries, Bettendorf argues that a fee of at least 25% of the recovery is customary, but that here, "[t]he trial court's erroneous discount of Bettendorf Counsel's contribution to the results obtained for the Wisconsin class means that its fee award to Bettendorf Counsel was just over 4[%] of the $100 million they recovered . . . ."[15] (Italics omitted.) We are not convinced, and instead agree with the trial court's conclusion "that there is no standard percentage, no benchmark percentage, no generally accepted number that the court can pull off the shelf and apply, not even as a starting point for further consideration." As the court noted, the number of factors courts are to consider in analyzing SCR 20:1.5(a) run contrary to Bettendorf's argument that there is a presumptive benchmark.

¶ 50. Bettendorf further contends that Microsoft's agreement with Spence/Capp counsel established a benchmark for similar services. The trial court, however, disagreed and concluded that the fee awarded to Spence/Capp counsel did not provide a useful comparison for determining the amount to be awarded to the Bettendorf attorneys, stating "[t]he Bettendorf lawyers have so disparaged the work of the Spence and Capp attorneys throughout this litigation that they can hardly expect me to conclude that the fee paid to those attorneys was reasonable or constitutes any sort of benchmark." (Italics omitted.) We agree with this conclusion.

[15] The Bettendorf attorneys attribute $100 million of the settlement amount as being solely the result of their own efforts.

¶ 51. Moreover, we are not convinced that the trial court's apportionment to the Bettendorf attorneys of 25% of the overall credit for the settlement was in error. Though Bettendorf attempts to minimize the significance of our supreme court's decision in *Olstad*, we, like the trial court, cannot overlook that in the absence of that favorable ruling, Bettendorf's case would not have been able to proceed and her attorneys would have recovered nothing.

¶ 52. As to Bettendorf's argument that the trial court erroneously valued the settlement at $70 to $100 million based on discounts that were applied without evidentiary bases, this too fails. The argument is the result of a footnote in the trial court's decision. In making this argument, Bettendorf overlooks that the rationale set forth in the court's footnote did not form the basis for the court's assessment. Instead, the court explained that in its prior memorandum decision, it had believed that it was necessary to determine the real monetary value of the plaintiffs' recovery; however, upon further review, it determined that this was not necessary and "refrained in [its subsequent] decision from applying the percentage-of-the-recovery method to what [it] believe[d] to be the real monetary value of the settlement." Notwithstanding this conclusion, the court explained in the footnote why it believed "there is more integrity in a computation that begins with the real monetary value of the settlement" and analyzed what the real monetary value of the settlement in this case was by employing various discounts. Despite this tangent, as discussed in the preceding paragraphs, the court never actually applied the discounts and instead used the face value of the settlement. Consequently, Bettendorf's argument that the trial court discounted the settlement below Microsoft's payout of approxi-

172

mately $145 million is incorrect. To the contrary, the trial court multiplied the face value of the settlement ($224 million) by the percentage it had arrived at (7.5%). The face value of $224 million was the *maximum* value of the deal if all eligible class members made claims, which we now know, did not occur.[16]

¶ 53. The court's sixty-six page decision reflects its use of a logical rationale in considering the claims asserted, based on the appropriate legal principles and facts of record. *See Kolupar I*, 275 Wis. 2d 1, ¶ 22. Although the Bettendorf attorneys wish that the trial court had analyzed things differently to support the positions they advance, "a court need give only a 'concise but clear explanation of its reasons for the fee award when the reasonableness [of the requested fee] is challenged.' " *See id.*, ¶ 52 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)); *see also id.*, ¶ 26 ("Admittedly, the [SCR 20:1.5] factors are often quite subjective. Therefore the results are open to significant variation."). As a result, we conclude that the trial court did not err in its assessment of the settlement.

*2. The trial court did not err in finding that the Minnesota settlement was "an obvious, virtually self-executing benchmark for settlement in this case."*

¶ 54. In its decision that elaborated on its award of fees in the underlying litigation, the trial court explained:

---

[16] Thus, setting aside the issue of the trial court's assessment that the Bettendorf attorneys deserved 25% of the credit for securing the settlement, it would seem that Microsoft got a better deal—the court used the $224 million face value of the settlement as opposed to the approximately $145 million Microsoft will actually pay.

173

> The amount of the settlement that the court ultimately approved was more favorable to the plaintiffs than the settlement which the Spence and Capp attorneys advocated, and it is true that the Bettendorf attorneys objected to the settlement proposed by the Spence and Capp classes and Microsoft, but the work of the Bettendorf attorneys was not the primary motivator. The settlement in this case followed closely on the heels of a settlement of a similar class action in Minnesota, setting an obvious, virtually self-executing benchmark for settlement in this case.

(Italics omitted.)

¶ 55. Bettendorf argues that the trial court erred when it found that the Minnesota settlement created "an obvious, virtually self-executing benchmark for settlement in this case." She asserts that "[t]his clear error," which downplayed her attorneys' importance in securing the outcome, made the trial court's analysis under SCR 20:1.5(a)(1) ("the skill requisite to perform the legal service properly"), SCR 20:1.5(a)(4) ("the amount involved and the results obtained"), and SCR 20:1.5(a)(7) ("ability of the lawyer or lawyers performing the services") erroneous. We disagree.

¶ 56. To support its position, Bettendorf takes credit for apprising the trial court of the lack of a *cy pres* provision in the March 2006 proposed settlement. However, the court made clear in its decision that "the superior price at which this case settled would have been achieved even without the Bettendorf objection, as a result of the court fulfilling its duties to protect Wisconsin consumers, and out of a natural inclination to keep up with our rivals across the river." (Italics omitted.) Moreover, the Bettendorf attorneys were not the only ones to object to the March 2006 proposed

174

settlement: the Wisconsin Department of Justice filed a separate objection expressing virtually the same concerns.

¶ 57. Bettendorf also contends that Microsoft was willing to accept a settlement analogous to that in Minnesota only when faced by counsel who had the ability, willingness, and resources to litigate beyond initial procedural motions, which clearly established that SCR 20:1.5(a)(1) and SCR 20:1.5(a)(7) weighed in favor of her attorneys.[17] The trial court, however, in explaining the inevitability of the price range that would ensue following the Minnesota settlement, found that "once a defendant has demonstrated a preference for settlement and a willingness to pay at a certain price point, parties in the cases that have yet to settle (and assuming that they fit the profile of the cases that have settled) are leaving money on the table if they don't demand at least as much as the last guy got." The court found that the Bettendorf attorneys advanced this very point in a memorandum in support of their fee request, where they argued:

> The inadequacy of the proposed March 2006 settlement was underscored when compared with the settlement negotiated by Bettendorf Counsel in the substantially similar action brought in Minnesota . . . . One would expect that the value of such settlements in these states would likely increase . . . as the litigation process draws to a close . . . . The proposed March 2006 settlement, however, would have been inconsistent with that trend.

(Italics omitted.) We, like the trial court, are unable to reconcile this position with the position that Bettendorf takes now in its cross-appeal.

---

[17] In addition to their representation of the Bettendorf plaintiffs, Zelle Hofmann represented class plaintiffs against Microsoft in California, Minnesota, and Iowa.

¶ 58. The trial court was fully aware of and took into account the various considerations Bettendorf raises in her cross-appeal. Once again, although she thinks the court should have analyzed the SCR 20:1.5(a) factors differently, we cannot conclude that the trial court's findings were clearly erroneous.[18] *See* WIS. STAT. § 805.17(2).

*3. The trial court did not err when it reduced Bettendorf's fees and costs incurred in the fee litigation.*

¶ 59. Bettendorf argues that the trial court erred by not awarding, in full, her requested fees of approximately $2.3 million and expenses of $282,518.02 incurred in the fee litigation. As relayed above, the court found that roughly one-third of the time invested by the Bettendorf attorneys related to the fee litigation could have been avoided. Accordingly, it reduced the number of hours for which the Bettendorf attorneys sought to recover fees by 1500 and likewise proportionately reduced the related expenses by approximately one-third. As a result of the reductions, Bettendorf was awarded

---

[18] As a final point, Bettendorf argues that the trial court erroneously found that there was no contingent fee agreement, which affected its analysis under SCR 20:1.5(a)(8) ("whether the fee is fixed or contingent"). She asserts that agreements with the named plaintiffs provided for "attorneys' fees up to the greater of the amount of one-third of the recovery obtained for you and the class or [counsel's] hourly time with an appropriate multiplier." It is unclear how this assertion fits within the context of Bettendorf's argument that the court erred in concluding that the Minnesota settlement created a benchmark. To the extent that this can be construed as an argument, we consider it undeveloped and do not need to consider it further. *See Barakat v. DHSS*, 191 Wis. 2d 769, 786, 530 N.W.2d 392 (Ct. App. 1995) (reviewing court need not address "amorphous and insufficiently developed" arguments).

$1.25 million in fees and $190,000 in expenses related to the subsequent fee dispute.

¶ 60. Bettendorf asserts that the trial court's findings that "if the fee request was less ambitious, the Herculean effort put into the briefing would not have been necessary" and that too much time was spent taking "depositions of Microsoft's lawyers . . . [which] bore little fruit" are unsupported by the evidence. According to Bettendorf, her attorneys would have spent the same amount of time litigating their fee request even if it had been in a lesser amount, and their efforts were the result of Microsoft's "militant" and "hardball" litigation tactics. She points to her attorneys' efforts to have the fee dispute resolved based on the affidavits and briefs. Finally, she claims that "even if the testimony from those four depositions [of Microsoft's attorneys] was worthless, it did not take 1500 hours (the time reduction by the trial court) to prepare for and take those depositions."

¶ 61. The trial court, "having witnessed the chronology of the dispute as it unfolded," was in the best position to assess the appropriate amount of fees to award in this matter. The court's factual findings regarding the impact of Bettendorf's fee request and the benefits of the discovery tactics the Bettendorf attorneys engaged in—20% of which "was spent launching discovery against Microsoft that was not necessary except to respond in-kind to the discovery initiated by Microsoft"—were not clearly erroneous.

¶ 62. Bettendorf also argues that Microsoft never identified an expense or item of time that it claimed was unreasonable. She similarly faults the trial court for not identifying any expenses that it deemed unreasonable. Bettendorf, however, does not cite any legal authority

requiring such identification. Meanwhile, Microsoft directs our attention to a case that would seem to support a proportionate reduction in claimed expenses. (Citing *Lane v. Sharp Packaging Sys., Inc.*, 2002 WI 28, ¶ 66, 251 Wis. 2d 68, 640 N.W.2d 788 (concluding that the trial court's award of half the attorney fees and expenses sought was reasonable and not an erroneous exercise of discretion)). Notwithstanding *Lane*, given that we will not consider propositions unsupported by legal authority, our consideration of Bettendorf's proposition ends here. *See State v. Shaffer*, 96 Wis. 2d 531, 546, 292 N.W.2d 370 (Ct. App. 1980).

¶ 63. Finally, we are not convinced that public policy dictates that Microsoft pay Bettendorf's attorneys' fees and costs in their entirety. Thus, we conclude that the trial court did not err in valuing the settlement, in determining that the Minnesota settlement was a benchmark, and by not awarding, in full, Bettendorf's requested fees and costs incurred in litigating the fee petition.[19]

*By the Court.*—Judgment affirmed and cause remanded with directions.

---

[19] Bettendorf asserts that her attorneys "are entitled to their reasonable lodestar and expenses incurred in this appeal." Her request, which is made in the conclusion section of her cross-appeal brief, is found within one sentence consisting of numerous subparts and cites to no legal authority. We do not address the merits of her argument because it was undeveloped by legal reasoning. *See Truttschel v. Martin*, 208 Wis. 2d 361, 369, 560 N.W.2d 315 (Ct. App. 1997).